J-S30035-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JONATHAN MONTE CORNISH | : | |
| | : | |
| Appellant | : | No. 200 MDA 2021 |

Appeal from the PCRA Order Entered January 12, 2021
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0001433-2013

BEFORE: BENDER, P.J.E., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.: **FILED: FEBRUARY 3, 2022**

Appellant, Jonathan Monte Cornish, appeals, *pro se*, from the order of the Court of Common Pleas of Dauphin County (trial court) that denied his petition filed under the Post Conviction Relief Act (PCRA).[1] After careful review, we affirm.

On August 21, 2014, Appellant was convicted by a jury of first-degree murder and attempted murder for beating Jose Vazquez to death with a hammer and assaulting Jose Vazquez's brother with a hammer on February 13, 2013 at Jose Vazquez's house in Harrisburg, Pennsylvania. N.T. Trial Vol. 3, at 38; ***Commonwealth v. Cornish***, No. 1562 MDA 2014, unpublished

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541–9546.

memorandum at 1-2 (Pa. Super. filed June 29, 2015). At trial, 10 witnesses testified for the Commonwealth, Dr. Wayne Ross, a forensic pathologist; William Vazquez, Jose Vazquez's brother; Christopher and Sonya Kifer, friends of William Vazquez who were with him on February 13, 2013; Jillian Crouch, a Pennsylvania State Police DNA analyst; and five police officers, detectives and investigators. Appellant testified in his own defense and also called one of the police witnesses who testified for the Commonwealth to provide additional testimony.

Dr. Ross testified as an expert in forensic pathology, which includes determination of the cause of death and blood stain and blood stain pattern analysis. N.T. Trial Vol. 1, at 28-34. Dr. Ross testified that he performed an autopsy on Jose Vazquez and opined, based on this autopsy, that Jose Vazquez was struck in the head with a hammer at least five times, that he was struck on other parts of his body, and that the cause of Jose Vazquez's death was traumatic brain injury from hammer blows to his head. *Id.* at 34-35, 37-52. Dr. Ross also testified that the blood stain patterns in photographs of the scene showed that Jose Vazquez was struck at least 10 times. *Id.* at 56-64. Dr. Ross testified that the castoff blood pattern showed that the assailant was in what he called a "void area" on the right or left side of Jose Vazquez when he inflicted the hammer blows, and described the term "void area" as an area "[w]here you just don't see much blood." *Id.* at 57, 63, 72-

73. Dr. Ross did not opine as to who struck Jose Vazquez or as to any physical characteristic of the assailant.

William Vazquez testified that he is a heroin and cocaine user and that on February 13, 2013, he and the Kifers, who were also drug users, went from York, Pennsylvania to his brother Jose's house to get drugs.  N.T. Trial Vol. 1, at 82-84, 92-95, 101-02.  William Vazquez testified that when he arrived at the house and knocked on the door no one answered, and that after he banged on the door for several minutes, Appellant let him and Christopher Kifer in and told them that Jose Vazquez was at a methadone clinic.  *Id.* at 106-10. William Vazquez testified that he started to go upstairs, that Appellant told him that he could not go upstairs and went up the stairs ahead of him and into Jose Vazquez's second floor bedroom, and that Appellant attacked him with a hammer when he tried to enter the bedroom, hitting him in the face and causing him to fall down the stairs.  *Id.* at 112-17.  He testified that Appellant came down the stairs after him with the hammer and that he ran to the kitchen and got a knife.  *Id.* at 113, 117-18.  William Vazquez testified that Appellant continued swinging the hammer at him, that he stabbed Appellant, and that Christopher Kifer got the hammer away from Appellant and held Appellant down on the floor.  *Id.* at 118-22.  William Vazquez testified that he then went back upstairs and found Jose Vazquez badly injured and making gurgling sounds and that he got angry and came back downstairs and tried to stab Appellant again, but that Christopher Kifer restrained him.

*Id.* at 122-24, 191-92. William Vazquez testified that the police and emergency personnel then arrived, and that the police made him drop the knife and took him in for questioning and released him after he gave a statement. *Id.* at 125-27. On cross-examination, William Vasquez testified that he did not notice any blood on Appellant or his clothes when he went into the house. *Id.* at 160.

Christopher Kifer and his wife, Sonya, testified that they went with William Vazquez to Jose Vazquez's house on February 13, 2013. N.T. Trial Vol. 1, at 225-26, 277-78. Christopher Kifer testified that when they arrived, Appellant answered the door and said that Jose Vazquez was not home, and that William Vazquez went in and started to go upstairs and he followed. *Id.* at 229-31. Christopher Kifer testified that he then heard William Vazquez say "Oh, my brother -- killed my brother," that William Vazquez rolled down the stairs into him, and that Appellant came down the stairs swinging a sledgehammer at them. *Id.* at 231, 239-42, 245, 262, 272-73. He testified that he and William Vazquez fought Appellant and tried to get the sledgehammer from him, that William Vazquez got a knife and stabbed Appellant, and that they were then able to subdue Appellant. *Id.* at 231-32, 240-46. Christopher Kifer testified that after they subdued Appellant, he had Sonya Kifer call the police and that the police took him in for questioning. *Id.* at 232, 245-51. On cross-examination, Christopher Kifer testified that he did

not notice any blood on Appellant or his clothes when he went into the house. *Id.* at 258.

Sonya Kifer testified that she stayed in the car while William Vazquez and her husband went in the house. N.T. Trial Vol. 1, at 278-79. She testified that 10 to 20 minutes later, her husband ran out screaming for her to call 911 because Jose Vazquez was dead. *Id.* at 279-80. Sonya Kifer testified that she went into the house and saw Appellant on the ground and her husband trying to keep William Vazquez from beating Appellant up. *Id.* at 280-82. Sonya Kifer testified that she went upstairs and saw blood all over the room and someone lying on the bed covered with a sheet. *Id.* at 282. She testified that she pulled the sheet back and saw Jose Vazquez severely injured but still trying to breathe, and that she called 911. *Id.* at 282-84.

The five police witnesses testified concerning what they found at the murder scene and identified evidence collected at the scene. Two of these witnesses testified that there were no signs of forced entry into the house. N.T. Trial Vol. 2, at 38, 163-64. One of the other officers, who rode in the ambulance with Appellant when he was taken to the hospital, testified that she read Appellant *Miranda*[2] warnings on the way to the hospital, although he was not in custody because the police did not yet know who had committed

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

what acts. *Id.* at 153-55. This officer testified that she asked Appellant what happened and Appellant said "I don't know." *Id.* at 155-56.

Ms. Crouch testified as an expert in DNA analysis concerning DNA testing that she performed on swabs from a sledgehammer, on a cutting from the front pocket of blue jeans that were removed from Appellant when he was taken to the hospital and on other items. N.T. Trial Vol. 2, at 62-66. Ms. Crouch testified that blood and bodily fluids create a much stronger DNA profile than skin contact. *Id.* at 81-82. The sledgehammer and the cutting from the blue jeans both tested positive for blood. *Id.* at 74, 176. With respect to the sledgehammer, Ms. Crouch testified that Jose Vazquez's DNA was on the flat head, pointed head and handle and that DNA of at least two other individuals that was insufficient for identification was on the handle. *Id.* at 73-77. Ms. Crouch testified that Jose Vazquez's DNA was on the cutting from Appellant's blue jeans. *Id.* at 77-79, 83.

Appellant testified that he was a heroin and cocaine user and met Jose Vazquez in December 2012 and later moved into Jose Vazquez's house. N.T. Trial Vol. 2, at 192, 197, 199-200. Appellant testified that on the morning of February 13, 2013, Jose Vazquez's landlord came to the house and that Appellant left the house to get drugs after Jose Vazquez came down to talk to the landlord. *Id.* at 200-03. He testified that he bought heroin and used it at an abandoned building and also bought cocaine before returning to the house. *Id.* at 203-05. Appellant testified that when he returned to the house and

knocked, Jose Vazquez did not answer, but that the door was unlocked and he went in and injected the cocaine. *Id.* at 205-07. Appellant testified that he then went upstairs and found Jose Vazquez on the bed with his head beaten in and blood all over. *Id.* at 208-09. Appellant admitted that he did not call 911 and was instead going to leave the house when William Vazquez arrived. *Id.* at 209-10. Appellant admitted that he lied to William Vazquez that Jose Vazquez was not home and that he tried to keep him from going upstairs, and testified that William Vazquez went upstairs, saw his brother's body and accused Appellant of killing him. *Id.* at 210-12. Appellant testified that William Vazquez began swinging at him and that he grabbed a hammer and hit William Vazquez with it in self-defense. *Id.* at 212-13. He testified that he then came down the stairs, that William Vazquez and Christopher Kifer struggled with him over the hammer, and that William Vazquez stabbed him. *Id.* at 214-16. Appellant testified that when the police came, he was put in an ambulance, but that he could not remember saying anything to any of the police at the scene or on the way to the hospital. *Id.* at 218-19. On cross-examination, Appellant testified that Jose Vazquez's head was not covered up when he found Jose Vazquez and that he could not explain how it later was covered by a sheet. *Id.* at 226-29.

Appellant was sentenced to life imprisonment for the murder conviction and a concurrent term of 20 to 40 years for the attempted murder conviction. N.T. Sentencing at 3-4; Sentencing Order. Appellant, represented by counsel,

filed a timely direct appeal challenging the Commonwealth's peremptory strike of an African American juror and the trial court's admission of photographs of Jose Vazquez's head injuries. On June 29, 2015, this Court affirmed Appellant's judgment of sentence. ***Commonwealth v. Cornish***, 122 A.3d 1148 (Pa. Super. 2015) (unpublished memorandum). Appellant's counsel filed a petition for allowance of appeal, which the Pennsylvania Supreme Court denied on December 30, 2015. ***Commonwealth v. Cornish***, 130 A.3d 1286 (Pa. 2015).

On January 3, 2017, Appellant filed a timely *pro se* PCRA petition. The trial court appointed PCRA counsel for Appellant and PCRA counsel filed a motion raising an additional PCRA claim and memoranda narrowing the PCRA claims that Appellant had raised in his initial PCRA petition. In response to PCRA counsel's filings, Appellant petitioned to proceed *pro se*, and on February 14, 2019, after conducting ***Grazier***[3] hearings, the trial court ordered that Appellant could proceed *pro se* and granted Appellant leave to file an amended PCRA petition. Appellant filed an amended *pro se* PCRA petition on April 11, 2019, and on May 20, 2020, sought leave to file a further PCRA petition. On June 11, 2020, the trial court granted Appellant leave to file a further amended PCRA petition and Appellant, on July 22, 2020, filed the amended PCRA petition at issue here.

---

[3] ***Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998).

The trial court held evidentiary hearings on Appellant's PCRA petition by videoconference on October 6, 2020 and December 15, 2020 at which Appellant, one of Appellant's two trial counsel, and the court reporter who transcribed Appellant's trial testified. On January 12, 2021, the trial court denied Appellant's PCRA petition. This timely appeal followed.

Appellant raises the following issues in this appeal:

I. Whether Appellant was denied the effective assistance of counsel where trial counsel:

(a) Labored under an actual conflict of interest?

(b) Failed to familiarize themselves with the physical and scientific evidence of the case?

(c) Advise[d] Appellant to concede guilt to attempted murder charge?

(d) Fail[ed] to impeach Commonwealth witnesses with expectation of leniency?

(e) Fail[ed] to object or ask for curative instructions?

II. Whether the PCRA Court committed reversible error by denying Appellant's motion to amend PCRA petition, motion for Court to exercise it[s] subpoena powers, motion for funds for bloodspatter expert and failing to give curative instructions constituting an abuse of discretion?

Appellant's Brief at 4 (suggested answers omitted).

Our review of an order denying a PCRA petition is limited to determining whether the record supports the PCRA court's findings and whether its decision is free of legal error. *Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015); *Commonwealth v. Johnson*, 236 A.3d 63, 68 (Pa. Super. 2020) (*en*

*banc*); ***Commonwealth v. Smith***, 181 A.3d 1168, 1174 (Pa. Super. 2018). We must view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party. ***Mason***, 130 A.3d at 617; ***Johnson***, 236 A.3d at 68; ***Commonwealth v. Stewart***, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*). The PCRA court's credibility determinations, if supported by the record, are binding on this Court. ***Mason***, 130 A.3d at 617; ***Johnson***, 236 A.3d at 68; ***Commonwealth v. Widgins***, 29 A.3d 816, 820 (Pa. Super. 2011).

With respect to Appellant's five claims of ineffective assistance of counsel, Appellant can be entitled to relief on these claims only if he proved: (1) that the underlying legal claim is of arguable merit; (2) that counsel's action or inaction had no reasonable basis designed to effectuate his client's interests; and (3) that he suffered prejudice as a result of counsel's action or inaction. ***Mason***, 130 A.3d at 618; ***Smith***, 181 A.3d at 1174-75; ***Commonwealth v. Michaud***, 70 A.3d 862, 867 (Pa. Super. 2013). The defendant must satisfy all three prongs of this test to obtain relief under the PCRA. ***Mason***, 130 A.3d at 618; ***Smith***, 181 A.3d at 1175; ***Michaud***, 70 A.3d at 867. To satisfy the prejudice element of an ineffective assistance of counsel claim, Appellant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. ***Mason***, 130 A.3d at 618; ***Stewart***, 84 A.3d at 707.

Appellant's first and fifth claims of ineffective assistance fail because the trial court resolved the disputed issues of fact on which they are based against Appellant and its findings are supported by the record. Appellant's first claim, that trial counsel had a conflict of interest, was based on the fact that he had filed a *pro se* malpractice complaint against trial counsel for alleged failure to turn discovery materials over to him. The trial court, however, found that trial counsel was unaware of Appellant's malpractice complaint. Trial Court PCRA Opinion at 4. That determination was supported by trial counsel's testimony at the PCRA hearing, which the trial court found credible. N.T. PCRA at 47-50; Trial Court PCRA Opinion at 4. Moreover, to establish a conflict of interest, the defendant must show that that his counsel actively represented conflicting interests. **Commonwealth v. Spotz**, 18 A.3d 244, 268 (Pa. 2011). As the trial court found, Trial Court PCRA Opinion at 4, Appellant introduced no evidence that his trial counsel represented the interest of anyone other than Appellant.

Appellant in his fifth claim asserts that trial counsel was ineffective for failing to object or request a curative instruction when William Vazquez allegedly stood up during Appellant's testimony and called Appellant a liar. The trial court, however, found that no such outburst occurred. Trial Court PCRA Opinion at 5-6. That finding is likewise supported by the record. No utterance of any kind by anyone other than Appellant, counsel who were questioning him, and the court appears in the transcript of Appellant's trial

testimony. N.T. Trial Vol. 2, at 191-245. Both trial counsel and the court reporter who transcribed Appellant's trial, who the trial court also found credible, testified that they did not recall hearing any outburst during Appellant's testimony and the trial court judge, who presided over both Appellant's trial and Appellant's PCRA proceeding, did not recall any outburst. N.T. PCRA at 38-40, 86-89; Trial Court PCRA Opinion at 5.

Appellant also failed to prove the facts that were the basis of his third ineffective assistance claim, that trial counsel allegedly advised him to concede that he was guilty of attempted murder and caused him to testify that he was guilty of the attempted murder of William Vazquez. The trial court found that Appellant did not, in fact, concede that he was guilty of attempted murder in his testimony at trial. Trial Court PCRA Opinion at 9. That finding is supported by the record. While Appellant testified "I think I did" in response to trial counsel's question "Did you intend to kill Willie when you swung the hammer at him?," he testified that this was in self-defense because William Vazquez was trying to kill him and was blocking his ability to escape. N.T. Trial Vol. 2, at 220. Moreover, trial counsel denied advising Appellant to concede guilt and testified that when she asked the question, her understanding, from what Appellant had said in preparation sessions, was that Appellant would answer that he was defending himself, not that he intended to kill William Vazquez. N.T. PCRA at 40-45. The trial court found that trial

counsel was a credible witness and that Appellant was not. Trial Court PCRA Opinion at 4-6.

Nor did the trial court err in rejecting Appellant's remaining second and fourth ineffective assistance of counsel claims. In his second claim, Appellant argues that trial counsel was ineffective in failing to obtain an expert on the issue of blood spatter and allegedly failing to research that subject. This claim fails because Appellant introduced no evidence that any expert existed that would negate Dr. Ross's opinions or benefit his case or that the trial counsel who examined the Commonwealth's blood spatter expert failed to educate himself concerning blood spatter.

Appellant bases this claim on the assertion that the term "void pattern" in blood stain analysis refers to a gap in a blood stain that shows that a person or object blocked the path of the blood. That, however, does not show that any expert would have reached any conclusion different from Dr. Ross on where the assailant stood or would have cast doubt on whether Appellant murdered Jose Vazquez. Dr. Ross did not testify concerning "void patterns" or that Appellant was in between the victim and the blood spatters on the wall. While Dr. Ross used the term "void area" briefly in his testimony, he made clear that he was using it to describe any area that blood spatter did not hit, not just obstructed areas, and testified that the assailant was not in the path of the blood spatter. N.T. Trial Vol. 1, at 57, 63, 72-73. Appellant points to

nothing in the blood spatter evidence that shows that the assailant would have been in the path of the castoff blood.

Appellant's contention that trial counsel failed to adequately prepare on this issue is based on the contention that the trial counsel who testified at the PCRA hearing allegedly did not know what a "void area" is. Contrary to this assertion, this trial counsel testified that she understood the term "void" in bloodstain analysis to mean "a missing point of splatter." N.T. PCRA at 27. Although she also testified that she could not, six years after trial, further explain what a "void area" is or how it is created, *id.* at 27-29, that does not show trial counsel was inadequately prepared at trial to address the blood spatter issue. The trial transcript shows that counsel who testified at the PCRA hearing was not the counsel who cross-examined Dr. Ross. N.T. Trial Vol. 1, at 64-75. The fact that trial counsel did not examine Dr. Ross on the issue of whether he used the term "void area" correctly does not show lack of knowledge of the term or ineffectiveness, as further examination on the term would have significantly highlighted Dr. Ross's briefly expressed opinion that the assailant would not have much blood on him, which would have been detrimental to Appellant's defense.

In his fourth claim, Appellant asserts that trial counsel was ineffective for allegedly failing to impeach William Vazquez, Christopher Kifer, and Sonya Kifer with the fact that they had pending criminal charges against them at the

time of trial. This claim fails because, to the extent that there was any support in the record for this claim, Appellant failed to show prejudice.

Appellant's claim that trial counsel did not put in evidence that any of these witnesses had criminal charges that were pending against them is contradicted by the record. The trial transcript shows that trial counsel specifically asked both Christopher and Sonya Kifer whether they had criminal charges against them. N.T. Trial Vol. 1, at 274, 293-94. Christopher Kifer admitted that he had pending criminal charges against him in York County and Sonya Kifer testified that the pending York County charges against her and Christopher Kifer included robbery, burglary, criminal trespass, and receiving stolen property. *Id.* In addition, the fact that Christopher and Sonya Kifer were being held in jail at the time of their testimony was brought to the jury's attention. *Id.* at 217, 276. Although trial counsel did not ask these witnesses whether they had an expectation of favorable treatment, the prosecution in Appellant's case had no jurisdiction over the pending charges, which were in another county, and there was no evidence that, at the time of trial, either of these witnesses had been offered any favorable treatment or that they would have testified that they had any expectation of leniency. To the contrary, Sonya Kifer testified that she had received no promise or offer concerning the pending charges in exchange for her testimony and the only allegedly favorable treatment that Appellant showed did not occur until more

than five months after Appellant's trial. *Id.* at 294; 7/22/20 Amended PCRA Petition Ex. G.

In the PCRA proceeding, Appellant did produce evidence that William Vazquez had drug and retail theft charges pending against him in York County at the time of Appellant's trial, but produced no evidence that any offer of favorable treatment on those charges could have been shown at trial. N.T. PCRA at 31; 7/22/20 Amended PCRA Petition Ex. G. Trial counsel did not ask William Vazquez about pending charges. Trial counsel, however, cross-examined William Vazquez extensively and brought out that he had criminal convictions for retail theft and false identification to law enforcement and that he has been charged with selling heroin. N.T. Trial Vol. 1, at 139-40, 208. In addition, William Vazquez's testimony showed that he had a far greater incentive to be biased in favor of the prosecution and accuse Appellant of attacking him first than the pending charges in another county could possibly create, as he testified that he stabbed Appellant and wanted to kill Appellant and that no charges had been brought against him. *Id.* at 119-21, 124, 127-28, 187-88, 192. Given these facts and the fact that the prosecution had no jurisdiction over the York County charges,[4] there is no reasonable probability

---

[4] *See Commonwealth v. Evans*, 512 A.2d 626, 631 (Pa. 1986) (holding that "a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him **within the same jurisdiction**") (emphasis added).

that the marginal impeachment value from cross-examination of William Vazquez on the pending charges would have had any effect on the outcome of Appellant's trial.

In his claims that do not involve ineffective assistance of counsel, Appellant argues that the trial court erred in denying three motions that he filed in the PCRA proceeding, a motion to amend the PCRA petition, a "Motion for PCRA Court to Exercise Its Subpoena Powers Under 42 Pa.C.S.A. § 5905 and Secure Proposed Witnesses Attendance," and a motion for appointment of a blood spatter expert.[5]  These claims of error are likewise without merit.

Amendment of a PCRA petition "shall be freely allowed to achieve substantial justice."  Pa.R.Crim.P. 905(A).  Consistent with this standard, the trial court twice allowed Appellant to amend his PCRA petition after he was granted leave to proceed *pro se*.  The only motion to amend that the trial court denied was filed by Appellant on November 9, 2020, after the October 2020 hearing on the PCRA petition.  Although a further hearing was to be held,

---

[5]  Appellant also argues that he was entitled to PCRA relief on the ground that the trial court failed to give a curative instruction at trial when William Vazquez allegedly stood up and called Appellant a liar during Appellant's testimony. This claim fails because claims of error by the court at trial cannot be asserted in a PCRA petition, as the PCRA prohibits claims that have been previously litigated or waived and claims of error at trial that are not ineffective assistance of counsel claims are necessarily previously litigated if they were raised on direct appeal or waived if they were not.  42 Pa.C.S. §§ 9543(a)(3), 9544; *Spotz*, 18 A.3d at 270; *Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 780 (Pa. Super. 2015) (*en banc*).  In addition, as discussed above, the trial court found that incident on which this claim is based did not occur.

that hearing was limited to taking the testimony of certain witnesses who had not been at the October 2020 hearing. N.T. PCRA at 66-67; Trial Court Order, 10/16/20, ¶2. Appellant in his November 2020 motion to amend asserted that the sole reason that he sought to amend was to raise claims based on the transcript of the closing arguments at his trial, but admitted that he received that transcript in July 2020, over two months before the October PCRA hearing. 11/9/20 Motion to Amend PCRA Petition ¶¶2, 3. Moreover, Appellant did not state what claims he sought to raise based on that transcript. Under these circumstances, the trial court did not err denying Appellant's November 2020 motion to amend his PCRA petition.

Appellant's subpoena motion requested that the trial court issue subpoenas for two of the four witnesses that were to testify at that hearing, a police officer who did not testify at trial and an emergency medical worker who was in the ambulance with Appellant on the way to the hospital. Motion for Court to Exercise Subpoena Powers ¶¶2-5. At the October 6, 2020 hearing, however, Appellant stated that he could subpoena those witnesses and confirmed that he would subpoena them if an additional hearing was scheduled. N.T. PCRA at 8-9, 66. In addition, the trial court in its October 16, 2020 order scheduling the December 2020 hearing clearly stated Appellant was to subpoena these two witnesses if he wished to have them testify at the hearing. Trial Court Order, 10/16/20, ¶2(c)-(d).

Appellant did not file his subpoena motion on December 4, 2020, two weeks before the final PCRA hearing. At the December 2020 hearing, Appellant did not contend that he had been prevented from accessing subpoenas and claimed instead that he did not do so because he was "overwhelmed." N.T. PCRA at 79. Given the tardiness of the motion and the fact that Appellant did not show that any circumstances had changed since he undertook to subpoena the two witnesses that were the subject of the motion, the trial court did not err in denying the motion and proceeding to conclude the PCRA hearing as scheduled.

The trial court also did not err in denying Appellant's motion for appointment of a blood spatter expert. While an indigent criminal defendant has a right to state-paid expert assistance at trial in some circumstances, **Ake v. Oklahoma**, 470 U.S. 68, 83-87 (1985), there is no right to appointment of an expert or state funding of an expert in a PCRA proceeding. **Commonwealth v. Paddy**, 15 A.3d 431, 470 (Pa. 2011); **Commonwealth v. Tedford**, 960 A.2d 1, 23 (Pa. 2008); **Commonwealth v. McDonald**, No. 241 EDA 2018, at 6 (Pa. Super. May 31, 2019) (unpublished memorandum). Moreover, as discussed above, Appellant made no showing that a blood spatter expert would offer any opinions that would be beneficial to his defense.

For the foregoing reasons, we conclude that Appellant has not shown that the trial court erred in denying his PCRA petition. Accordingly, we affirm the trial court's order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/03/2022